**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>MANUEL LEE MOSLEY,<br><br>  Defendant. | No. CR09-3023-MWB<br><br>**REPORT AND RECOMMENDATION
ON MOTION TO SUPPRESS** |

_____

The defendant Manuel Lee Mosley is charged in Count Two of a two-count indictment with possessing a Ruger, model LCP, .380 caliber pistol after having been convicted of domestic abuse assault, in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(2). *See* Doc. No. 3. On July 7, 2009, Mosley filed a motion to suppress. Doc. No. 20. He alleges statements he made to officers were coerced and involuntary, and "in violation of his *Miranda*[1] rights," and therefore should be suppressed. *Id.*, p. 1. He also argues the Ruger pistol should be suppressed as the "fruit of the poisonous tree." *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)). The plaintiff (the "Government") resisted the motion on July 17, 2009. Doc. No. 27. On July 21, 2009, the defendant filed a reply brief. Doc. No. 28.

The Trial Management Order assigned motions to suppress to the undersigned to conduct any necessary evidentiary hearing, and to prepare a report on, and recommended disposition of, the motion. *See* Doc. No. 9, § IV.A. Accordingly, the court held a hearing on the motion on July 23, 2009, at which Assistant U.S. Attorney Shawn Wehde appeared on behalf of the Government, and Mosley appeared with his attorney Alexander Esteves. The Government offered the testimony of Iowa Department of Criminal Investigation Agent Larry Hedlund. Five exhibits were admitted into evidence, to-wit:

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Gov't Ex. 3, a CD containing audio recordings of Hedlund's interview of Mosley on August 2, 2008, and a telephone call from Hedlund to Mosley on October 13, 2008; Gov't Ex. 1 and Def's Ex. 101, transcripts of the first part of the August 2, 2008 interview; Gov't Ex. 2, a transcript of the second part of the August 2, 2008 interview; and Def's Ex. 102, a transcript of the October 13, 2008 telephone call. The motion is now fully submitted and ripe for review.

The following background facts are relevant to consideration of Mosley's motion. In the early morning hours of August 2, 2008, officers in Fort Dodge, Iowa, learned that Jason Fox, a co-defendant in this case, had been shot. After some initial investigation, the officers determined Mosley was probably the shooter. The officers obtained, and then executed, two state search warrants, one for the residence of Mosley's mother, where Mosley was staying, and the other for Mosley's vehicle. When the officers executed the search warrant for the residence, they entered the house in full protective gear and with their guns drawn. They found Mosley inside, asleep on a mattress, and ordered him onto the floor. He complied. They placed him in handcuffs, searched him, and asked him if there were any firearms in the residence. He responded that there were none. He immediately was taken from the residence, his handcuffs were removed, and he was placed in the front passenger's seat of Agent Hedlund's unmarked state car.[2] Mosley then was interviewed by Hedlund. The entire interview, which was recorded, was in a conversational tone and was largely nonconfrontational. *See* Gov't Ex. 3.

Hedlund began the interview by apologizing to Mosley for the "rude awakening," and then told Mosley he was "not under arrest." He advised Mosley that the officers had a search warrant for the house, and Mosley had been removed from the house to "make sure everybody was safe." At this point, another officer told Mosley to give him his car keys so the police could execute the search warrant on his car, and Mosley complied.

---

[2]It is unclear whether Mosley got into the car on his own initiative or was asked to sit in the car by the police, although the latter explanation seems the most likely.

Hedlund then explained that there had been an incident earlier that morning, and he had evidence Mosley was involved. He related that several individuals had been drinking and had gotten into an argument, and part of the argument had taken place at a convenience store in Fort Dodge. He told Mosley there was evidence that Mosley was at the convenience store at the time of the argument. Mosley admitted he was there. He explained that earlier that evening, he had had a confrontation with someone in a bathroom in a downtown bar. They later crossed paths again at the convenience store, and the other person had challenged Mosley to a fight. Mosley agreed to the fight, and followed the other person to another location. Mosley drove in his own car, and his cousin followed in another car. When they arrived, the other person ran into a house and came out with a shotgun, and fired the shotgun two or three times in the direction of Mosley's cousin's car.

Hedlund had Mosley draw a picture of the scene of the shooting. After some discussion about the drawing, Hedlund advised Mosley that the person who had fired the shotgun had, himself, been shot, and according to Mosley's drawing, Mosley's vehicle was where shell casings from the shooting had been found. Hedlund also informed Mosley that witnesses had identified him as the shooter. Hedlund then said, "What we're looking at here, what I'm thinking is a self-defense issue."

Hedlund advised Mosley the police were aware that four rifles and a handgun had been stolen from a store, and they were trying to get the guns off the street. He asked for Mosley's help. Mosley responded that he did not have the gun involved in the shooting, but he could try to find it. Hedlund asked if Mosley had taken the gun someplace, and Mosley responded, "Yeah. It's nowhere around here." Mosley asked for ten or twenty minutes to retrieve the gun, and Mosley gave his word "on [his] kids" he would come back. After some discussion, Hedlund restated that Mosley was not under arrest, but told him if he would "go get the gun and be back here in 10 or 15 minutes, I'll sit right here." He also stated, "If you don't come back, you have my word as a police officer, I

3

will hound you. And every time you stop someplace, I will try to get a search warrant and search what car you're in and what house you are in." Mosley responded, "All right. I'll go get it right now then." They "shook on it," and Mosley left in his car[3] to retrieve the gun.

A short time later, Mosley came back with the Ruger pistol, delivered it to the police, and then spoke further with Hedlund in his unmarked patrol car. Hedlund began the conversation by telling Mosley, "I appreciate you keeping your word. You're not under arrest. You're leaving when we're done. You're getting out of the car and walking away." Mosley then made several incriminating statements, including admitting that he had shot at the other person. He stated, "I was trying to scare them. I wasn't trying to hit nobody." Hedlund asked Mosley to help law enforcement recover the remaining stolen firearms, and Mosley agreed to try. Mosley then left.

On October 13, 2008, Hedlund telephoned Mosley and advised him that the police had recovered the stolen firearms without any assistance from Mosley. Mosley explained that he had been unsuccessful because nobody would talk with him because they thought he was a snitch. Hedlund advised Mosley that he was going to be charged federally with unlawful possession of the firearm, but he might be able to help himself if he cooperated with law enforcement. Mosley responded that he was not able to help the police.

In Mosley's brief to this court, he argues the statements he made to Hedlund on August 2, 2008,[4] were the product of a custodial interrogation conducted without his first being advised of his *Miranda* rights. Doc. No. 20-2, p. 7. Alternatively, he argues the statements were involuntary. *Id*., p. 9. Finally, he argues the handgun, and the statements he made during his telephone conversation with Agent Hedlund on October 13, 2008, were the "fruit of the poisonous tree." *Id*., p. 13.

---

[3]By this time, the search of the car had been completed.

[4]In his motion, he recites that the interview was on May 2, 2008 (*See* Doc. No. 20, p. 1), but this obviously was a scrivener's error.

4

The burden of showing admissibility rests on the Government:

> "[T]he burden of showing admissibility rests, of course, on the prosecution." *Brown v. Illinois*, 422 U.S. 590, 604, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975). The prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver, *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), and the voluntariness of the confession, *Lego v. Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972).

*Missouri v. Seibert*, 542 U.S. 600, 609 n.1, 124 S. Ct. 2601, 2608 n.1, 159 L. Ed. 2d 643 (2004); *see United States v. Aguilar*, 384 F.3d l520, 523 (8th Cir. 2004). The Government concedes Mosley was never given *Miranda* warnings, but argues that *Miranda* does not apply because Mosley was not in custody when he made the statements.

Mosley's August 2, 2008, statements were involuntary only if they were "extracted by threats, violence, or express or implied promises sufficient to overbear [his] will and critically impair his capacity for self-determination." *Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001) (citing *United States v. Pierce*, 152 F.3d 808, 812 (8th Cir. 1998)). In making this determination, the court "look[s] at the totality of the circumstances surrounding the interrogation, including law enforcement officials' conduct and the defendant's capacity to resist any pressure." *Id.* (citing *Pierce*, and *Bramlett v. Lockhart*, 876 F.2d 644, 646 (8th Cir. 1989)). In this case, there is no evidence that even suggests Mosley's statements were involuntary. However, because Mosley was never advised of his *Miranda* rights, if his statements were the product of a custodial interrogation, they would have to be suppressed. *See, e.g.*, *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S. Ct. 1285, 1293, 84 L. Ed. 2d 222 (1985) (*Miranda* requires that an unwarned custodial admission be suppressed); *United States v. Vega-Rico*, 417 F.3d 976, 981 n.2 (8th Cir. 2005) ("Unwarned questioning is . . . a violation of the *Miranda* warnings designed to protect Fifth Amendment rights."); *United States v. Carter*, 884 F.2d 368, 372 (8th Cir. 1989) (unwarned custodial statements must be suppressed). Because

5

Mosley produced the handgun as a direct result of this questioning, the gun also would have to be suppressed, under the "fruit of the poisonous tree" doctrine of *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963).[5] If Mosley was not in custody when he made the statements, neither the statements nor the gun should be suppressed.

Thus, the determinative question in this case is whether Mosley was in custody when he made the statements. A person is "in custody" when he is formally arrested or when his freedom of movement is restrained to a degree equivalent with formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983). "The most obvious and effective means of demonstrating that a suspect has not been 'taken into custody or otherwise deprived of . . . freedom of action,' . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) (quoting *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612). Half of this procedure was employed here. Mosley was advised he was not under arrest, but was never told he had the right to terminate the interview at will. If Mosley also had been told he was free to terminate the interview, this would have ended the inquiry. As the Eighth Circuit Court of Appeals held in *United States v. Czichray*, 378 F.3d 822 (8th Cir. 2004):

> We believe that this abundant advice of freedom to terminate the encounter should not be treated merely as one equal factor in a multi-factor balancing test designed to discern whether a reasonable person would have understood himself to be in custody. That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview.

---

[5]Further analysis would be required to determine whether the statements made by Mosley during the October 3, 2008, telephone call would be the "fruit of the poisonous tree."

6

*Id.*, 378 F.3d at 826. However, allowing the police to avoid the requirements of *Miranda* by merely telling a suspect he is not under arrest "would provide law enforcement officers with a complete 'end run' around *Miranda*." *United States v. Colonna, IV*, 511 F.3d 431, 436 (4th Cir 2007). This is not permitted. Because Mosley was not told he was free to terminate the interview, further analysis is required.

In *Griffin*, the court identified six factors for a court to consider in making a custody determination: (1) whether the suspect was informed during the interview that the questioning was voluntary, that he could ask the officers to leave, or that he was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect voluntarily acquiesced to official questioning or initiated contact with authorities; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether there was a police-dominated atmosphere; and (6) whether the suspect was placed under arrest at the termination of the questioning. *Id*. The court will apply the *Griffin* factors to the facts of this case, but this analysis will not be not determinative. The Eighth Circuit has cautioned,

> Although the "non-exhaustive" *Griffin* factors and their attendant balancing test are often cited in our decisions concerning *Miranda*, we recently resolved the question of "custody" as an *en banc* court with nary a mention of *Griffin*. *See United States v. LeBrun*, 363 F.3d 715, 719-24 (8th Cir. 2004) (en banc). There is no requirement, therefore, that the *Griffin* analysis be followed ritualistically in every *Miranda* case. When the factors are invoked, it is important to recall that they are not by any means exclusive, and that "custody" cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly. Exploring the nuances of such vague factors as "voluntary acquiescence," "strong arm tactics," and "police-dominated atmosphere" in order to place them on one side or the other of a balancing scale may tend to lose sight of the forest for the trees. The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest. And the court must consider whether the

7

> *historical facts*, as opposed to the one-step-removed *Griffin* factors, establish custody. The debatable marginal presence of certain judicially-created factors that ostensibly tend to "aggravate the existence of custody" cannot create the functional equivalent of formal arrest where the most important circumstances show its absence.

*Czichray*, 378 F.3d at 827-8 (emphasis in original).

Applying the *Griffin* factors to the facts of this case, Mosley was told he was under arrest, but he was not told he could terminate the interview and leave whenever he wanted. He was not handcuffed during questioning, but he was in a police car. He voluntarily acquiesced to official questioning, but he did not initiate contact with authorities. There is no evidence strong arm tactics were used during questioning, but there is some evidence that deceptive stratagems were employed. (For instance, Hedlund suggested to Mosley that self defense might provide a legal justification for the shooting when this likely was not true.) The atmosphere was, to some extent, "police dominated." The questioning took place in a police car after armed police officers had entered Mosley's residence, awakened him at gunpoint, and placed him in the car. Several officers remained in the area during the questioning. However, the questioning was in a conversational tone, and was largely nonconfrontational, and Mosley was not placed under arrest at the termination of the questioning.

The court finds the *Griffin* analysis is not particularly helpful in this case. It simply arrays facts on each side of the question, and does not really answer whether Mosley "was restrained as though he were under formal arrest." *Czichray, 378 F.3d*. at 828; *see United States v. Cartier*, 543 F.3d 442, 448 (8th Cir. 2008) ("[F]or *Miranda* purposes, we make a two-part inquiry: (1) was he formally placed under arrest or (2) was his freedom of movement restrained to the degree associated with a formal arrest.").

In the majority of the reported cases on this subject, courts have reached the conclusion that the defendant was not in custody, but in most of these cases, the defendant was advised both that he was not under arrest and that he was free to terminate the

8

questioning and/or leave at any time. *See, e.g.* (in each of which cases, the court held that the defendant was not in custody), *United States v. Lawson*, 563 F.3d 750, 753 (8th Cir. 2009) (defendant was questioned in his own home, and agents told him he did not have to answer questions and would not be arrested); *United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir. 2009) (defendant was told he was free to leave and could terminate the interview whenever he wished); *United States v. Cartier*, 543 F.3d 442, 448 (8th Cir. 2008 (defendant was advised he was not required to give a statement and was free to leave); *United States v. Bordeaux*, 400 F.3d 548, 559-560 (8th Cir. 2005) (defendant was questioned in an FBI agent's vehicle, but was informed he would not be arrested and was free to leave at any time); *United States v. Brave Heart*, 397 F.3d 1035, 1037 (8dth Cir. 2005) (defendant was advised he was not under arrest and was free to leave); *Czichray*, 378 F.3d 822 at 826 (defendant was advised that his participation in the interview was voluntary and he was free to leave); *United States v. Galceran*, 301 F.3d 927, 930-31 (8th Cir. 2002) (officers told defendant he was free to leave and he would not be arrested that day).

In the present case, although Mosley was told at least three times that he was not under arrest, he was not told he was free to leave until after he had made incriminating statements, and he was never told he had the right to terminate the questioning. The Eighth Circuit has considered one case involving somewhat analogous facts, and held the defendant was in custody at the time of questioning. *See United States v. Ollie*, 442 F.3d 1135 (8th Cir. 2006). Judge Mark W. Bennett of this court described the facts of *Ollie* as follows:

> In *Ollie*, the police wanted to talk with the defendant about a handgun found at his girlfriend's house. The police contacted Ollie's probation officer, who agreed to order Ollie to go to the police station the next day after his regularly scheduled probation meeting. The probation officer ordered the defendant to go to the station after the meeting, where he was interviewed without being given his *Miranda* warnings.

9

> Although the defendant was told that he was not under arrest, he was not told that he could refuse to answer questions. After twice stating that he did not own or possess a gun, the defendant admitted handling the gun when the police asked if he would continue to deny ownership of the gun if told that the police found his fingerprints on the weapon. The defendant then agreed to make a written statement, and was given his *Miranda* warnings. The defendant subsequently moved to suppress statements that he made during his interview with the police and his written statement, arguing that the police's failure to give him *Miranda* warnings at the outset of the interview made all of his statements inadmissible. The district court denied the motion, concluding that the defendant was not in custody when he confessed and therefore the police had no obligation to give the defendant *Miranda* warnings before questioning him. In reversing, the Eighth Circuit Court of Appeals found that the defendant was in custody when he made his statement, and therefore it should have been suppressed.

*United States v. Becker*, 2007 WL 81960 at *5 (N.D. Iowa, Jan. 9, 2007) (internal citations to *Ollie* omitted).

However, *Ollie* is distinguishable both on its facts and on the Eighth Circuit's holding. As Judge Bennett summarized, "The court of appeals's reasoning was based in large part on the fact that the defendant was not at the police station voluntarily, but was only there because he had been ordered to go by his probation officer. The court of appeals found it particularly significant that the defendant's statement was made in a 'police-dominated atmosphere', the police station." *Id.* (internal citations to *Ollie* omitted). In contrast, Mosley was questioned outside his own home, in a nonthreatening manner, after being told he was not under arrest. As noted by the *Ollie* court, "the fact that questioning tak[es] place on a suspect's 'home turf' cuts against a finding of custody[.]" *Ollie*, 442 F.3d at 1139 (citing *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984)); *see Becker*, 2007 WL 81960 at *5.

Further guidance in making the determination of whether or not an interrogation is custodial was provided by the Eighth Circuit Court of Appeals in *United States v. LeBrun*, 363 F.3d 715 (8th Cir. 2004) (en banc):

> "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson* [*v. Keohane*], 516 U.S. [99,] 112, 116 S. Ct. [457,]457[, 133 L. Ed. 2d 383 (1995)] (footnote omitted). Thus, the critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's "freedom to depart was restricted in any way." [*Oregon v.*] *Mathiason*, 429 U.S. [492,] 495, 97 S. Ct. 711[, 50 L. Ed. 2d 714 (1977)]. In answering this question, we look at the totality of the circumstances while keeping in mind that the determination is based "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 322-23, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994).

*LeBrun*, 363 F.3d at 720. The court clarified that, "the relevant inquiry is not whether any random reasonable person would have determined that he was in custody, but whether a reasonable person in the defendant's position would have considered his freedom of action restricted to the degree associated with a formal arrest." *Id.*, 363 F.3d at 723.

The court notes, but is unable to resolve, the apparent inconsistency in the pronouncements of the *LeBrun* court. The *LeBrun* court held a suspect is in custody for purposed of *Miranda* if his freedom to depart is restricted "in any way" (citing *Mathiason*), but further held a suspect is in custody only if a reasonable person in the suspect's position would "have considered his freedom of action restricted to the degree associated with a formal arrest." *LeBrun*, 363 F.3d at 720. These statements can be reconciled only if *any* restriction on the suspect's freedom to depart is equivalent to a formal arrest. This is patently untrue. Consider, for example, an officer's right to stop

11

and detain someone briefly for purposes of inquiry when the officer believes criminal activity may be afoot. *Terry v. Ohio*, 391 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). "One is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning. But most *Terry* stops do not trigger the detainee's *Miranda* rights." *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003).

Therefore, although the court acknowledges that Mosley's freedom to leave at will was restricted to some degree by the police, the court will proceed to analyze whether his freedom of action was restricted to the degree associated with a formal arrest.

Mosley's freedom of action obviously was restricted to some extent. A short time before he gave his statement, he had been placed in handcuffs by armed police officers, forcibly removed from his house, and placed in a police car. Although there is some question about whether he voluntarily got into the car, a reasonable person under these circumstances would have believed he had no choice. He could not return to his mother's house – the police had just removed him from the house to search it. He could not drive away in his car – it also was being searched. Although he presumably could have refused to answer Hedlund's questions and tried to leave the car and walk away, it is doubtful, under the totality of the circumstances, that a reasonable person would have believed he had that right.

This conclusion is reinforced by the interplay between Hedlund and Mosley after Mosley indicated he could retrieve the gun and deliver it to the police. Before leaving to retrieve the gun, Mosley asked Hedlund for permission to leave, which suggests he believed he was not free to leave without such permission. When Mosley delivered the gun to Hedlund, Hedlund stated, "You're leaving *when we're done*. You're getting out of the car and walking away" (Gov't Ex. 2, p. 1) (emphasis supplied). This statement indicates Mosley was free to leave, but only after the interview was finished, and not before.

Although the evidence establishes Mosley's freedom of action was restricted to some degree when he made these statements, this does not necessarily lead to a conclusion that the statements must be suppressed. According to *LeBrun*, there is a middle ground between a situation where no limits are placed on a suspect's freedom of action and a situation where limits equivalent to those associated with a formal arrest are placed on a suspect's freedom of action. In this middle ground, although a suspect might, for all practical purposes, be in police custody, the suspect may not be in custody for purposes of *Miranda*.

In the present case, the court must determine whether a reasonable person in Mosley's situation would have considered his freedom of action restricted to the degree associated with a formal arrest. If so, his statements should be suppressed. If not, his statements should not be suppressed. The Government has the burden of proof on this question. *See Missouri v. Seibert, supra*.

The court finds that when Mosley was questioned, his freedom of action was not restricted to a degree associated with a formal arrest. When he was being questioned, Mosley knew the police were searching his home and car, and that he was not allowed to go to those locations. He also realized the police were keeping him under their control while they conducted the searches. Because he was aware of these limitations, he knew he did not have complete freedom of movement. On the other hand, his handcuffs had been removed, and although he was not told he was free to terminate the interview and leave, he was told he was not under arrest. He was seated in the front seat of a police car, not the more restrictive back seat. He was not taken to the police station or placed in an interview room, but was questioned at the scene. Only one officer participated in the questioning. He was interviewed in a conversational manner, not a confrontational one. Under Eighth Circuit jurisprudence, the court finds the restrictions on Mosley's freedom

of action fell short of the restrictions associated with a formal arrest. Therefore, Mosley was not in custody at the time of his interviews in Hedlund's police car.[6]

Accordingly, the undersigned finds Mosley's statements and the gun seized as result of his statements should not be suppressed, and RESPECTFULLY RECOMMENDS that his motion to suppress be **denied**. Objections to this Report and Recommendation must be filed **by August 3, 2009**. Responses to objections must be filed by **August 10, 2009**.

IMPORTANT NOTE: Any party planning to lodge an objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **July 30, 2009, regardless of whether the party believes a transcript is necessary to argue the objection**. If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 27th day of July, 2009.

*[signature]*

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[6]Although this conclusion is mandated under Eighth Circuit jurisprudence, as a practical matter, the court finds it unlikely that any reasonable person in Mosley's position actually would believe he had a right to refuse to answer questions and leave the scene. The court further doubts that if Mosley had refused to answer questions and had attempted to leave the scene, he would have been allowed to do so by the officers.