**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

MANUEL LEE MOSLEY,

        Defendant.

No. CR09-3023-MWB

**ORDER CONCERNING**
**MAGISTRATE'S REPORT AND**
**RECOMMENDATION REGARDING**
**DEFENDANT'S MOTION TO**
**SUPPRESS**

_____

**TABLE OF CONTENTS**

*I.* *INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A.* *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B.* *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   *A.* *Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   *B.* *Objection To Finding of Fact* . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   *C.* *Objections To Legal Conclusions* . . . . . . . . . . . . . . . . . . . . . . . 12
      *1.* *Necessity for Miranda warnings* . . . . . . . . . . . . . . . . . . 12
      *2.* *Voluntariness of statements* . . . . . . . . . . . . . . . . . . . . 19

*III.* *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# I. INTRODUCTION AND BACKGROUND

## A. Procedural Background

On May 20, 2009, an indictment was returned against defendant Manuel Lee Mosley, charging defendant Mosley with possession of a firearm after having been convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(2). On July 7, 2009, defendant Mosley filed a motion to suppress. In his motion, defendant Mosley seeks to suppress statements he made to law enforcement officers on the ground that his statements were involuntary and were obtained without his having been informed of his constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant Mosley also seeks to suppress the Ruger pistol that forms the basis for the current charge on the ground that it is "the fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

Defendant Mosley's motion to suppress was referred to Chief United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b). After conducting an evidentiary hearing, on July 23, 2009, Judge Zoss filed a Report and Recommendation in which he recommends that defendant Mosley's motion to suppress be denied. Judge Zoss concluded that defendant Mosley's freedom of action was not restricted to a degree associated with a formal arrest at the time he was interviewed by the police. Thus, Judge Zoss found that defendant Mosley was not in custody at the time of his interview and, therefore, that no *Miranda* warning was required to be given. Judge Zoss also concluded that there was no evidence that defendant Mosley's statements were made other than of his own free will. Accordingly, Judge Zoss concluded that defendant Mosley's statements to the police, as well as the Ruger pistol, should not be suppressed. Therefore, Judge Zoss recommended that defendant Mosley's motion to suppress be denied. After obtaining an extension of time, defendant Mosley filed his objections to Judge Zoss's Report and

Recommendation. The prosecution then filed a timely response to defendant Mosley's objections as well as its own objections to Judge Zoss's Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant Mosely's motion to suppress.

## B. Factual Background

In his Report and Recommendation, Judge Zoss made the following findings of fact:

> In the early morning hours of August 2, 2008, officers in Fort Dodge, Iowa, learned that Jason Fox, a co-defendant in this case, had been shot. After some initial investigation, the officers determined Mosley was probably the shooter. The officers obtained, and then executed, two state search warrants, one for the residence of Mosley's mother, where Mosley was staying, and the other for Mosley's vehicle. When the officers executed the search warrant for the residence, they entered the house in full protective gear and with their guns drawn. They found Mosley inside, asleep on a mattress, and ordered him onto the floor. He complied. They placed him in handcuffs, searched him, and asked him if there were any firearms in the residence. He responded that there were none. He immediately was taken from the residence, his handcuffs were removed, and he was placed in the front passenger's seat of Agent Hedlund's unmarked state car. Mosley then was interviewed by Hedlund. The entire interview, which was recorded, was in a conversational tone and was largely nonconfrontational. *See* Gov't Ex. 3.
>
> Hedlund began the interview by apologizing to Mosley for the "rude awakening," and then told Mosley he was "not under arrest." He advised Mosley that the officers had a search warrant for the house, and Mosley had been removed from the house to "make sure everybody was safe." At this point, another officer told Mosley to give him his car keys so the police could execute the search warrant on his car, and

Mosley complied.

Hedlund then explained that there had been an incident earlier that morning, and he had evidence Mosley was involved. He related that several individuals had been drinking and had gotten into an argument, and part of the argument had taken place at a convenience store in Fort Dodge. He told Mosley there was evidence that Mosley was at the convenience store at the time of the argument. Mosley admitted he was there. He explained that earlier that evening, he had had a confrontation with someone in a bathroom in a downtown bar. They later crossed paths again at the convenience store, and the other person had challenged Mosley to a fight. Mosley agreed to the fight, and followed the other person to another location. Mosley drove in his own car, and his cousin followed in another car. When they arrived, the other person ran into a house and came out with a shotgun, and fired the shotgun two or three times in the direction of Mosley's cousin's car.

Hedlund had Mosley draw a picture of the scene of the shooting. After some discussion about the drawing, Hedlund advised Mosley that the person who had fired the shotgun had, himself, been shot, and according to Mosley's drawing, Mosley's vehicle was where shell casings from the shooting had been found. Hedlund also informed Mosley that witnesses had identified him as the shooter. Hedlund then said, "What we're looking at here, what I'm thinking is a self-defense issue."

Hedlund advised Mosley the police were aware that four rifles and a handgun had been stolen from a store, and they were trying to get the guns off the street. He asked for Mosley's help. Mosley responded that he did not have the gun involved in the shooting, but he could try to find it. Hedlund asked if Mosley had taken the gun someplace, and Mosley responded, "Yeah. It's nowhere around here." Mosley asked

for ten or twenty minutes to retrieve the gun, and Mosley gave his word "on [his] kids" he would come back. After some discussion, Hedlund restated that Mosley was not under arrest, but told him if he would "go get the gun and be back here in 10 or 15 minutes, I'll sit right here." He also stated, "If you don't come back, you have my word as a police officer, I will hound you. And every time you stop someplace, I will try to get a search warrant and search what car you're in and what house you are in." Mosley responded, "All right. I'll go get it right now then." They "shook on it," and Mosley left in his car to retrieve the gun.

A short time later, Mosley came back with the Ruger pistol, delivered it to the police, and then spoke further with Hedlund in his unmarked patrol car. Hedlund began the conversation by telling Mosley, "I appreciate you keeping your word. You're not under arrest. You're leaving when we're done. You're getting out of the car and walking away." Mosley then made several incriminating statements, including admitting that he had shot at the other person. He stated, "I was trying to scare them. I wasn't trying to hit nobody." Hedlund asked Mosley to help law enforcement recover the remaining stolen firearms, and Mosley agreed to try. Mosley then left.

On October 13, 2008, Hedlund telephoned Mosley and advised him that the police had recovered the stolen firearms without any assistance from Mosley. Mosley explained that he had been unsuccessful because nobody would talk with him because they thought he was a snitch. Hedlund advised Mosley that he was going to be charged federally with unlawful possession of the firearm, but he might be able to help himself if he cooperated with law enforcement. Mosley responded that he was not able to help the police.

Report and Recommendation at pp. 2-4 (footnotes omitted). Upon review of the record, the court adopts all of Judge Zoss's factual findings that have not been objected to by the

parties.

## II.  LEGAL ANALYSIS

### A.  Standard Of Review

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation).  While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask.  Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).  Thus, a district court *may* review de novo any issue in a magistrate judge's report and recommendation at any time.  *Id*.  If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C.

6

§ 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while de novo review generally entails review of an entire matter, in the context of § 636 a district court's *required* de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general pro se objections to

require a de novo review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, this court will strive to provide de novo review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give de novo review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the

Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less

deferential standard.[1]

---

[1] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will *not* result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed de novo, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g., United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions de novo." (citation omitted)).

As noted above, both defendant Mosley and the prosecution have filed objections to Judge Zoss's Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant Mosley's motion to suppress.

### B. Objection To Finding of Fact

The prosecution objects to Judge Zoss's finding that: "Although there is some question about whether [Mosley] voluntarily got into the car, a reasonable person under these circumstances would have believed he had no choice." Report and Recommendation at 12. The prosecution points to the following testimony of Iowa Division of Criminal Investigation Officer Larry Hedlund to support its argument that defendant Mosley voluntarily got into Officer Hedlund's car:

> A.   I didn't personally handcuff him. I removed the handcuffs. I asked him to talk to me in my car. I didn't order him into my car. I didn't demand that he talk to me.
>
> BY MR. WEHDE:
>
> Q.   And did he verbally or basically agree in some way to get in your car?
>
> A.   He got in my car. I didn't put him in my car. I didn't walk him over to the passenger's side and force him to get in.
>
> Q.   Did you open the door for him, or did he just get in on his own?
>
> A.   He got in. I didn't - -I got in the driver's side; he got in on the passenger's side.

Evidentiary Hearing Tr. at 45-46.

While the quoted portion of Officer Hedlund's testimony supports the proposition that Officer Hedlund did not order or force defendant Mosley to get into his car, this does not resolve the question of whether a reasonable person in defendant Mosley's position under these circumstances would have believed he had no choice but to sit in the officer's car. Given the circumstances in which defendant Mosley found himself, the court agrees with Judge Zoss's conclusion. Defendant Mosley had just been removed from his mother's apartment in restraints by an armed tactical team of law enforcement officers. Because law enforcement officers were searching his mother's apartment, he could not return there. Defendant Mosley also did not have the option of driving away from the scene since his car was also subject to a search warrant. Moreover, defendant Mosley was not told prior to his getting into Officer Hedlund's car that he was not under arrest and was never told that he was free to leave. Therefore, the prosecution's objection to this finding of fact is overruled.

### C.  Objections To Legal Conclusions

### 1.     Necessity for Miranda warnings

Both defendant Mosley and the prosecution have filed objections to Judge Zoss's legal analysis concerning whether defendant Mosley's statements were made while in custody. Defendant Mosley objects to Judge Zoss's conclusion that his statements were not made while in custody and therefore no *Miranda* warnings were required to be given to him before he was questioned. The prosecution does not object to Judge Zoss's conclusion that defendant Mosley's statements were not made while in custody. Rather, the prosecution's objection is that Judge Zoss should have focused his analysis more on the

six factors the Eighth Circuit Court of Appeals identified in *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

The *Miranda* safeguards only apply to one "who is subjected to custodial police interrogation", *Miranda*, 384 U.S. at 439, which is defined to include the deprivation of one's freedom of action "in any significant way." *Id.* at 444; *accord United States v. Lawson*, 563 F.3d 750, 752-53 (8th Cir. 2009)("[W]arnings are required when interrogation is 'initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'") (quoting *United States v. New,* 491 F.3d 369, 373 (8th Cir. 2007) (quoting in turn *Miranda,* 384 U.S. at 444); *United States v. Martinez*, 462 F.3d 903, 909-10 (8th Cir. 2006) ("*Miranda* warnings are required only where a person's freedom has been so restricted as to render him 'in custody.'"); *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) ("*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'"); *United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir. 2005) ("*Miranda* warnings are required only where a person is deemed to be in custody."). The *Miranda* doctrine is premised on the assumption that the interaction of custody and police interrogation results in a danger of coercion. *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). As the Eighth Circuit Court of Appeals has pointed out:

> The clearest example of custody is when a suspect is placed under formal arrest. Absent a formal arrest, the police must give *Miranda* warnings when the suspect's freedom of movement is restricted to a degree akin to a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed.2d 1275 (1983) (per curiam); *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (*en banc*), *cert. denied*, 543 U.S. 1145, 125 S. Ct. 1292, 161 L. Ed.2d 105 (2005).

*United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006); *see Black Bear*, 422 F.3d at 661 ("The ultimate inquiry to determine custody for *Miranda* purposes is whether there was a formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest."). Whether an individual is in custody is not dependant on the individuals own subjective belief, "but turns on whether a reasonable person in his shoes would have felt free to end the interview." *Ollie*, 442 F.3d at 1137; *accord Martinez*, 462 F.3d at 909; *LeBrun*, 363 F.3d at 720. The Eighth Circuit Court of Appeals has instructed that in deciding whether a person is in custody, a court must consider "all the circumstances confronting the person when he or she was questioned." *Ollie*, 442 F.3d at 1137; *accord United States v. Elzahabi*, 557 F.3d 879, (8th Cir. 2009); *Martinez*, 462 F.3d at 909. "'Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" *LeBrun,* 363 F.3d at 720 (quoting *Thompson v. Keohane,* 516 U.S. 99, 112 (1995)). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 323 (1994).

In *United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir. 1990), the Eighth Circuit Court of Appeals identified six factors to consider in determining whether an individual is in custody for the purposes of *Miranda*:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with

> authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.2d at 1349. These factors, however, "are not exclusive; custody 'cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly.'" *Elzahabi*, 557 F.3d at 883 (quoting *United States v. Czichray*, 378 F.3d 822, 827-28 (8th Cir. 2004), *cert. denied*, 125 S. Ct. 2514 (2005)); *see also Brave Heart*, 397 F.3d at 1039 ("[T]he indicia of custody identified in *Griffin* are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract.").[2]

After examining the totality of the circumstances--including but not limited to the *Griffin* factors set out above--the court finds defendant Mosley was not in custody on either occasion when he was interviewed by Officer Hedlund on August 2, 2008, and therefore

---

[2]The Eighth Circuit Court of Appeals has instructed that:

> Although the "non-exhaustive" *Griffin* factors and their attendant balancing test are often cited in our decisions concerning *Miranda,* we recently resolved the question of "custody" as an *en banc* court with nary a mention of *Griffin*. *See United States v. LeBrun,* 363 F.3d 715, 719-24 (8th Cir. 2004) (en banc). There is no requirement, therefore, that the *Griffin* analysis be followed ritualistically in every *Miranda* case.

*United States v. Czichray*, 378 F.3d 822, 827 (8th cir. 2004). Because there is no requirement that the *Griffin* analysis be applied in every *Miranda* case, the prosecution's objection that Judge Zoss should have focused his analysis more on the six *Griffin* factors is overruled.

the fact that *Miranda* warnings were not given before either interview does not bar his statements to Officer Hedlund. The first factor to be considered is whether the suspect was informed during the interview that the questioning was voluntary, that he could ask the officers to leave, or that he was not considered under arrest. *Griffin*, 922 F.2d at 1349; *see Elzahabi*, 557 F.3d at 883; *Martin*, 369 F.3d at 1057. Here, it is undisputed that defendant Mosley was informed at the beginning of the first interview that he was not under arrest. Officer Hedlund reiterated to defendant Mosley that he was not under arrest on multiple occasions during the two interviews. Moreover, during his second interview, Officer Hedlund told defendant Mosley that he would not be arrested that day. *See Ollie*, 442 F.3d at 1138 (observing that "advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine."). At the conclusion of both interviews, defendant Mosley was allowed to leave. The court concludes that this factor weighs in favor of a finding that the interviews took place in a noncustodial setting.

The second *Griffin* factor looks to whether the suspect possessed unrestrained freedom of movement during the questioning. *Griffin*, 922 F.2d at 1349; *see Elzahabi*, 557 F.3d at 883; *Martin*, 369 F.3d at 1057. Both of defendant Mosley's interviews with Officer Hedlund were conducted in the front seat of his unmarked police car on a public street in Fort Dodge, a public place. *See United States v. Bordeaux*, 400 F.3d 548, 560 (8th cir. 2005) (finding that defendant was not in custody where he was questioned in an unmarked law enforcement vehicle parked in front of his home by two law enforcement officers); *United States v. Martin*, 369 F.3d 1046, 1057 (8th Cir. 2004) (noting fact officers interviewed defendant in public place an indication he was not in custody). At the conclusion of the first  interview, defendant Mosley left Officer Hedlund's car and drove away in his own automobile. After he returned with the handgun and was interviewed a

second time by Officer Hedlund, defendant Mosley again left Officer Hedlund's car. Thus, the court finds that this factor weighs in favor of a finding that defendant Mosley was not in custody during either interview. The third factor identified in *Griffin* is whether the suspect voluntarily acquiesced to official questioning or initiated contact with authorities. The court's review of the recording of the two interviews reveals that defendant Mosley spoke in a conversational manner with Officer Hedlund. Defendant Mosley did not demonstrate any reluctance to answer Officer Hedlund's questions. The court, therefore, finds that defendant Mosley voluntarily acquiesced to Officer Hedlund's questioning and concludes that this factor also weighs in favor of a finding that the interviews took place in a noncustodial setting.

The fourth *Griffin* factor requires the court to determine whether Officer Hedlund employed strong arm tactics or deceptive stratagems during questioning. *Griffin*, 922 F.2d at 1349; *see Elzahabi*, 557 F.3d at 883; *Martin*, 369 F.3d at 1057. In this case, the undisputed evidence reveals Officer Hedlund spoke to defendant Mosley in a conversational manner and the interview was cordial and professional. There is no evidence in the record that Officer Hedlund used any psychological ploys or deceptive stratagems during either interview with defendant Mosley. Accordingly, this factor too weighs in favor of a finding that defendant Mosley was not in custody during either interview. The fifth *Griffin* factor requires the court to determine "whether the atmosphere of the questioning was police dominated." *Griffin*, 922 F.2d at 1349; *see Elzahabi*, 557 F.3d at 883; *Martin*, 369 F.3d at 1057. Here, defendant Mosley points to the fact that he was awakened and then taken, in restraints, from his mother's apartment by armed law enforcement officers as demonstrating that his interviews took place in a police dominated environment. This argument, however, ignores several pertinent facts. While defendant Mosley was handcuffed initially when he was removed from his mother's apartment, the

handcuffs were immediately removed by Officer Hedlund once defendant Mosley was outside. Moreover, while six or seven law enforcement officers were involved in the search of his mother's apartment and his car, only Officer Hedlund was present in the automobile during the two interviews. Thus, defendant Mosley's two interviews with a lone law enforcement officer were not in a police-dominated atmosphere. Accordingly, this factor also weighs against a finding of custody. The sixth and final *Griffin* factor is whether the suspect was arrested. *Griffin*, 922 F.2d at 1349; *see Elzahabi*, 557 F.3d at 883; *Martin*, 369 F.3d at 1057. Unlike the defendant in *Griffin,* defendant Mosley was not placed under arrest at any point during, or at the conclusion of, either interview. Rather, at the end of each interview, defendant Mosley left Officer Hedlund's car. The court finds this factor also weighs in favor of a finding that the interviews took place in a noncustodial setting. In addition to the *Griffin* factors, it bears mentioning that defendant Mosley's two interviews with Officer Hedlund were quite short in length, with the first lasting less than twelve minutes and the second only thirteen minutes. *See LeBrun*, 363 F.3d at 723 (taking note of the shortness of the interview in assessing whether defendant was in custody).

Considering the totality of the circumstances, the court concurs with Judge Zoss's conclusion that defendant Mosley was not in custody when he was interviewed by Officer Hedlund, and therefore the fact that *Miranda* warnings were not given does not bar the introduction of these interviews. The court, therefore, overrules defendant Mosley's objection to this portion of Judge Zoss's Report and Recommendation.

## 2.  *Voluntariness of statements*

Defendant Mosley also objects to Judge Zoss's conclusion that "there is no evidence which even suggests Mosley's statements were involuntary." Report and Recommendation at 5. The prosecution bears the burden of showing, by a preponderance of the evidence, that defendant Mosley's statements were made voluntarily. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). However, as defendant Mosley was not in custody when the statements were made, no element of coercion is assumed. Nevertheless, the Supreme Court has recognized that "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear [an interrogee's] will to resist and bring about confessions not freely self-determined.'" *Beckwith v. United States,* 425 U.S. at 347-48 (1976) (quoting *Rogers v. Richmond,* 365 U.S. 534, 544 (1961)). "'A statement is not voluntary if the totality of the circumstances shows the defendant's will was overborne,' and voluntary statements must not be the result of deception, intimidation, or coercion of the person giving the statement." *United States v. Jimenez,* 478 F.3d 929, 932-33 (8th Cir. 2007) (quoting *United States v. Annis,* 446 F.3d 852, 855 (8th Cir. 2006)). "The appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Astello,* 241 F.3d 965, 967 (8th Cir. 2001) (quoting *United States v. Kilgore,* 58 F.3d 350, 353 (8th Cir. 1995));*see Brave Heart,* 397 F.3d at 1040; *Martin,* 369 F.3d at 1055. "However, an interrogation of a suspect will always involve some pressure "'because its purpose is to elicit a confession.'" *United States v. Dehghani*, 550 F.3d 716, 720 (8th Cir. 2008) (quoting *Martin,* 369 F.3d at 1055*)*.

Upon review of the record, the court concludes that the interviews were both

conducted in a non-threatening environment, in a civil manner free of displays of force, intimidation, or strong-arm tactics. Both interviews were short in duration, lasting less than fifteen minutes in each instance. Significantly, no evidence whatsoever was presented at the evidentiary hearing indicating that defendant Mosley's will was overborne. Considering the totality of the circumstances, the court concludes that defendant Mosley's statements were not compelled or coerced, but rather that they were given freely, voluntarily and of defendant Mosley's own free will. The court, therefore, also overrules defendant Mosley's objection to this portion of Judge Zoss's Report and Recommendation.[3]

## III. CONCLUSION

Therefore, for the reasons set out above, the court, upon a *de novo* review of the record, accepts Judge Zoss's Report and Recommendation and **denies** defendant Mosley's Motion To Suppress.

---

[3]Neither party has objected to the specific portion of Judge Zoss's Report and Recommendation in which he recommends denying defendant Mosley's motion to suppress with regard to the Ruger handgun. After conducting its review of the record, the court is not "'left with [a] definite and firm conviction that a mistake has been committed,'" and finds no reason to reject or modify Judge Zoss's recommendation with respect to the Ruger handgun. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Therefore, the court accepts this portion of Judge Zoss's Report and Recommendation and orders that defendant Mosley's motion to suppress is denied with respect to the Ruger handgun.

**IT IS SO ORDERED.**

**DATED** this 9th day of September, 2009.

_Mark W. Bennett_

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA